**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, P.O. Box 14596 Washington, DC 20044, Plaintiff, v. U.S. DEPARTMENT OF THE TREASURY, 1500 Pennsylvania Avenue, NW Washington, DC 20220, SCOTT BESSENT, in his official capacity as Secretary of the Treasury 1500 Pennsylvania Avenue, NW Washington, DC 20220 Defendants. | Case No. 26-cv-2728 |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**INTRODUCTION**

1.      In his second term in office, President Trump and his administration have engaged in a concerted effort to exploit the judicial process to achieve political objectives that are fundamentally unlawful, such as shielding the President, his family, and his businesses from federal tax liability, attempting to assert federal control over state-run electoral processes, and steering billions in federal dollars to the President's political allies and sympathizers. The administration has tried to whitewash these unscrupulous objectives by routing them through seemingly legitimate court proceedings, a strategy that one federal court described as attempting "to gain the imprimatur of judicial legitimacy" on activities that have "no viable basis in law or fact." *Trump v. IRS*, 26-cv-20609, 2026 WL 2015525, at \*17 (S.D. Fla. July 13, 2026).

1

2.      Perhaps the most egregious example of the administration's attempts to illegitimately manipulate the judicial process—and one of the most egregious examples of government corruption and self-dealing in American history—was the creation of a $1.776 billion slush fund, established under the guise of a settlement agreement in a lawsuit that the President brought against federal agencies that he controls.[1] Through this collusive "settlement," the administration attempted to transfer nearly $2 billion of taxpayer money from the Treasury Department's Judgment Fund to an independent account to be used for the sole purpose of enriching the President's political allies—including convicted felons who participated in the assault on the U.S. Capitol on January 6, 2021—all with no statutory authorization, congressional or judicial oversight, or public transparency.

3.      Considerable criticism from both sides of the aisle and multiple lawsuits challenging the legal validity of the slush fund ultimately led to the Acting Attorney General to announce a decision to "not mov[e] forward with the Fund"[2] and to rescind the order establishing the fund.[3] The legal effect of the rescission order is unclear, considering it was issued without the agreement of the other parties to the underlying suit. But the administration continues to support the idea of providing federal payouts to January 6th defendants, and hundreds of them have pivoted

---

[1] *See* Press Release, *Justice Department Announces Anti-Weaponization Fund*, DOJ (May 18, 2026), https://perma.cc/V9TK-TPKW; Settlement Agreement of May 18, 2026, *Trump v. IRS*, 26-cv-20609 (S.D. Fla.)*,* https://perma.cc/3ATE-YVGK; Attorney General Order of May 18, 2026, https://perma.cc/5GGE-D3YV.

[2] House Appropriations Comm., *Oversight Hearing – DOJ*, at 40:30-41:00 (YouTube, June 2, 2026), https://tinyurl.com/ym67xahs; *see also* Alexander Bolton, *GOP Sen. Cassidy Calls Out Trump DOJ's $1.8 Billion Compensation Fund as 'Slush Fund'*, The Hill (May 18, 2026), https://tinyurl.com/bdhvayje.

[3] Acting Att'y Gen. Todd Blanche (@DAGToddBlanche), X (Aug. 2, 2026, 11:09 PM), https://tinyurl.com/yna63pc6.

to pursuing payouts through the Federal Tort Claims Act (FTCA) process, seeking millions of dollars in restitution for alleged wrongdoings related to their prosecution.[4]

4.      DOJ's recent use of the FTCA claims settlement process suggests that it might provide a path for compensating the President's political cronies, even those whose FTCA claims suffer from obvious legal deficiencies. For example, DOJ recently agreed to pay $1.25 million to settle an FTCA case brought by the President's former National Security Adviser, Michael Flynn, for wrongful prosecution, despite the fact that Flynn had pleaded guilty to his crimes and a district court had already dismissed Flynn's FTCA case for failure to state a claim.[5]

5.      Common to these efforts to manipulate the judicial process for the enrichment of the President's political allies is use of the Judgment Fund as the source of the federal dollars being transferred. The Judgment Fund is a permanent, indefinite appropriation administered by Treasury and used for the payment of qualifying final judgments or compromise settlements. *See* 31 U.S.C. § 1304. The Judgment Fund statute includes transparency provisions that require Treasury to publicly disclose important settlement payment details—such as the names of claimants and their counsel and a brief statement of facts giving rise to the claims being settled. *Id.* § 1304(d). These disclosure requirements are designed to provide the American public with the opportunity to scrutinize how their federal dollars are being spent, including to ascertain whether the government might be misusing the Judgment Fund to engage in waste, fraud, or abuse.

---

[4] *See* Dan Rosenzweig-Ziff, *Trump's allies have another plan to pay 'weaponization' victims*, Reuters (Jun. 12, 2026), https://tinyurl.com/3f5v2fdk; *see also* Complaint, *Sullivan v. United States*, 26-cv-00220 (M.D. Fla. Mar. 27, 2026).

[5] Stipulation for Compromise Settlement and Release of [FTCA] Claims Pursuant to 28 U.S.C. § 2677, *Flynn v. United States*, 23-cv-485 (M.D. Fla. Mar. 17, 2026), https://perma.cc/R8T9-CW73; Order, *Flynn v. United States*, 23-cv-485, 2024 WL 5057537, at *8 (M.D. Fla. Dec. 10, 2024).

6.      Treasury, however, has adopted an across-the-board policy of noncompliance with several of these statutory transparency provisions (the noncompliance policy). Under its noncompliance policy, Treasury uniformly withholds the names of individual plaintiffs or claimants and their counsel and the statement of facts giving rise to the claims. In lieu of providing the statement of facts, Treasury instead publishes in a biweekly report a "case citation code" and brief, one-to-two word "citation code description." But even these brief descriptors are often inaccurate or misleading, making it difficult for the public to confirm which settlements have been paid and the actual reasons for the settlement of a claim.

7.      Treasury relies on the Privacy Act to justify its noncompliance policy. While the Privacy Act might protect some payment information from public disclosure in certain scenarios, it does not broadly prohibit disclosure in all cases; it does not prohibit the disclosure of publicly available information; it does not apply to deceased persons, their next-of-kin, or foreign persons; it allows for the disclosure of information released under the Freedom of Information Act (FOIA); and it applies only to information that is both retrievable by personal identifier and actually retrieved by such an identifier.

8.      Treasury's noncompliance policy is not justified by the Privacy Act and violates both the transparency provisions of the Judgment Fund statute and the obligations imposed by the Paperwork Reduction Act to "ensure that the public has timely and equitable access to the agency's public information." 44 U.S.C. § 3506(d)(1). This suit challenges Treasury's application of the noncompliance policy to Judgment Fund payments made during the Trump-Vance administration.

9.      Plaintiff Citizens for Responsibility and Ethics in Washington (CREW) is a non-profit, government watchdog organization whose core mission entails monitoring Executive Branch spending of appropriated funds, shining a light on abuses of taxpayer money, and analyzing

and widely disseminating to the public federal records on those subjects. CREW is actively engaged in multiple projects relating to federal spending under the Trump-Vance administration and is directly harmed by Defendants' failure to post relevant Judgment Fund data during the President's current term in office.

10.    Treasury's application of the noncompliance policy during the current administration is a matter of growing urgency. Several recent settlements and the purported demise of the slush fund indicate that the administration is ramping up its use of the FTCA settlement process as a means for channeling federal dollars to January 6th defendants and other political cronies. The noncompliance policy would shield those payouts from public scrutiny. CREW would remain unable to search biweekly payment reports by the names of convicted January 6th defendants or their counsel, to search the names of high-profile political allies of President Trump who have publicly announced a desire to acquire federal payouts, or to review the factual bases for Judgment Fund payments to identify potential abuses of the claims settlement process. Treasury's actions thus prevent CREW from scrutinizing the current administration's spending of appropriated funds and heighten the likelihood for abuse of the Judgment Fund.

## JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, namely, the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*. This Court may grant declaratory relief, injunctive relief, mandamus relief, and other appropriate relief pursuant to 28 U.S.C. §§ 1361, 1651, 2201-2202, and 5 U.S.C. § 706.

12.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants reside in this district; a substantial part of the events or omissions giving rise to the claim occurred within this district; and Plaintiff resides in this district.

## PARTIES

13.     Plaintiff CREW is a non-profit, non-partisan organization committed to protecting the rights of citizens to be informed about the activities of government officials and agencies and to ensuring the integrity of government officials and agencies. CREW seeks to empower citizens to have an influential voice in government decisions and in the government decision-making process through the dissemination of information about public officials and their actions. To advance its mission, CREW uses a combination of research, litigation, and advocacy. As part of its research, CREW uses government records made available to it under public disclosure laws and widely disseminates those records to the public.

14.     Defendant the United States Department of the Treasury is an executive department of the United States and an agency within the meaning of the APA, 5 U.S.C. § 551(1). Treasury is responsible for promoting economic prosperity and ensuring the financial security of the United States. Treasury, through its Bureau of the Fiscal Service (BFS), administers and certifies payments from the Judgment Fund. BFS also executes Treasury's responsibilities to comply with the public reporting provisions of the Judgment Fund statute.

15.     Defendant Scott Bessent is the Secretary of the Treasury. Secretary Bessent is ultimately responsible for the administration of the Judgment Fund. Secretary Bessent is sued in his official capacity.

## LEGAL FRAMEWORK

**The Judgment Fund Statute**

16.     The Constitution's Appropriations Clause provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. This "straightforward and explicit command" requires anyone seeking money from the

federal government—including court ordered damages—to identify a statutory appropriation that authorizes payment. *OPM v. Richmond*, 496 U.S. 414, 424 (1990).[6] An agency's operating appropriations generally cannot be used to pay judgments against the federal government unless Congress provides otherwise.[7]

17.    Historically, Congress authorized the payment of judgments pursuant to an appropriation specific to each particular judgment, but as the nation grew, this system became unworkable, and Congress pursued other approaches to facilitate the payment of judgments.[8] By the first half of the 20th century, appropriations for payments occurred on an annual basis; monetary judgments were reported each year to Congress, and Congress would typically make a separate appropriation to satisfy the previous year's judgments.[9] In theory, this approach allowed Congress the opportunity to withhold payment for judgments with which it disagreed. In practice, however, that rarely happened and the costs of the yearly-appropriation system, such as the accrual of post-judgment interest, outweighed the benefits.[10]

18.    To address these issues, in 1956, Congress enacted the Judgment Fund statute, creating a permanent, indefinite appropriation for the payment of final judgments which are not otherwise provided for by another source of funds.[11] Congress has amended the statute several times, including to authorize payments for compromise settlements of actual or imminent litigation

---

[6] *See also* Andrew S. Coghlan, Cong. Rsch. Serv. (CRS), IF13139, *Congress's Authority to Restrict Monetary Civil Settlements* 1 (Dec. 22, 2025), https://tinyurl.com/y2k63eyu.

[7] *See* 3 U.S. Gov't Accountability Off., GAO-08-978SP, *Principles of Federal Appropriations Law* 14-10 (3d ed. 2008), https://tinyurl.com/f5y9snye.

[8] CRS, *Congress's Authority to Restrict Monetary Civil Settlements* at 1.

[9] *Id.*

[10] *Id.*

[11] 70 Stat. 694 (July 27, 1956), currently codified at 31 U.S.C. § 1304.

7

where the litigation could have resulted in a monetary judgment;[12] to authorize payments arising from judgments issued by state or foreign tribunals;[13] to eliminate a ceiling on payment amounts;[14] and to transfer the responsibility for certification of payments from the Comptroller General to the Treasury Department.[15]

19.     In 2019, Congress amended the Judgment Fund statute to include transparency provisions that require the Secretary of the Treasury to make available certain information on Treasury's public website, "unless the disclosure of such information is otherwise prohibited by law or a court order."[16] Disclosure must be made "as soon as practicable, but not later than 30 days after the date on which a payment under this section is tendered." 31 U.S.C. § 1304(d). Among other items, the statute requires Treasury to publish: "[t]he name of the plaintiff or claimant"; "[t]he name of counsel for the plaintiff or claimant"; and "[a] brief description of the facts that gave rise to the claim." *Id.* §§ 1304(d)(2), (3), (5).

20.     Congress passed these transparency provisions as part of the Open Book on Equal Access to Justice Act (the "OB/EAJA"), which was incorporated at Title IV, Subtitle C, into the John D. Dingell, Jr. Conservation, Management, and Recreation Act. The OB/EAJA was signed into law by President Trump. The Act was designed to "facilitat[e] critical public and Congressional oversight" of payments.[17] The Act's primary sponsor, Representative Doug Collins (R-Ga.), described the Act as "provid[ing] greater transparency over government payments" by

---

[12] Pub. L. No. 87-187, § 3, 75 Stat. 416 (Aug. 30, 1961).

[13] Pub. L. No. 87-187, § 1, 75 Stat. 415 (Aug. 30, 1961).

[14] Supplemental Appropriations Act of 1977, Pub. L. No. 95-26, §1302, 91 Stat. 61, 96 (May 4, 1977).

[15] Pub. L. No. 104-316, § 202(m), 110 Stat. 3826, 3843 (Oct. 19, 1996).

[16] John D. Dingell, Jr. Conservation, Management, and Recreation Act, Title IV, Subtitle C, § 4201, Pub. L. 116-9, 133 Stat. 580, 762 (Mar. 12, 2019), codified at 31 U.S.C. § 1304(d).

[17] 165 Cong. Rec. E241-04 (daily ed. Mar. 5, 2019) (statement of Rep. Doug Collins).

imposing "critical reporting requirements that provide the American people and Congress with the ability to see how taxpayer dollars are spent."[18]

21.    Within Treasury, the Judgment Fund is administered by BFS.[19] BFS certifies payments from the Judgment Fund when the following four tests have been met: (1) awards or settlements are final; (2) awards or settlements are monetary (that is, they require the payment of specific sums of money awarded against the United States); (3) one of the authorities specified in 31 U.S.C. § 1304(a)(3) provides for payment of the award or settlement from the Judgment Fund; and (4) payment may not legally be made from any other source of funds. 31 C.F.R. § 256.1(a). BFS "must deny any request for payment that fails to satisfy" these requirements. *Id.* § 256.54.

22.    To comply with the Judgment Fund statute's transparency provisions, BFS publishes a biweekly report on its website.[20] Despite the specific statutory reporting requirements, BFS has expressly adopted a policy of categorically withholding individual names and factual details from its biweekly report. On its website, BFS explains that policy as follows:

> "Individual names have been redacted on this website to comply with the Privacy Act. The brief description of facts that gave rise to the claim often contains personally identifiable information (PII) that cannot be disclosed under the Privacy Act. Consequently, the case citation code and citation code description have been substituted for the brief description of facts, as they do not contain PII, and provide more consistent information about the reason for the claim."[21]

---

[18] Press Release, *Open Book on Equal Access to Justice Act Passes House*, U.S. House of Representatives, Comm. on the Judiciary (Feb. 7, 2019), https://perma.cc/3C4J-92KG.

[19] U.S. Dep't of the Treasury, Treasury Financial Manual, Vol. I, Pt. 6, Ch. 3100, § 3125, https://tfx.treasury.gov/tfm.

[20] U.S. Dep't of the Treasury, Bureau of the Fiscal Service, Bi-Weekly Payment Report, https://tinyurl.com/48bkb25b.

[21] *Id.*

23. Treasury also maintains a "Judgment Fund Payment Search" tool, which allows the public to search judgment fund payments by date range or defendant agency.[22] The search tool also provides the ability to download a spreadsheet listing all payments made in a previous calendar year. The spreadsheet generated through use of the search tool differs in substance from the information included in the BFS biweekly report, but both items withhold individual names and a summary of facts.

**The Privacy Act**

24. The Privacy Act provides that "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains [subject to 13 exceptions]." 5 U.S.C. § 552a(b).

25. For the Privacy Act's prohibitions to attach, several conditions must be satisfied. The release of information must qualify as a "disclosure" and the information disclosed must qualify as a "record" contained within a "system of records." *Id.* § 552a(b). A "system of records" is one "from which information is retrieved by the name of the individual or by some . . . other identifying particular assigned to the individual." *Id.* § 552a(a)(5). "A system of records exists only if the information . . . is both retrievable by personal identifier and actually retrieved by personal identifier." *Paige v. DEA*, 665 F.3d 1355, 1359 (D.C. Cir. 2012). The disclosure must also occur without consent or in the absence of an applicable exception.

26. Additionally, the Privacy Act "does not apply to information that has already been fully disclosed to the public[.]" *Barry v. DOJ*, 63 F. Supp. 2d 25, 26 (D.D.C. 1999). "Deceased

---

[22] U.S. Dep't of the Treasury, Judgment Fund Payment Search, https://tinyurl.com/47ebtz38.

individuals do not have any Privacy Act rights, nor do executors or next-of-kin."[23] The Privacy Act does not apply to foreign persons. 5 U.S.C. § 552a(a)(2). And disclosures must satisfy the "retrieval rule," meaning that the disclosure "generally must be the result of someone having actually retrieved the 'record' from [a] 'system of records'; the disclosure of information is not ordinarily a violation merely because the information happens to be contained in the records." *Armstrong v. Geithner*, 608 F.3d 854, 857 (D.C. Cir. 2010) (cleaned up).

27.    Treasury maintains Judgment Fund payment records in a system referred to as "Department of the Treasury, Bureau of the Fiscal Service .002—Payment Records."[24] Although records in this system are capable of being retrieved by a personal identifier, they are also capable of being retrieved by other means, such as "date of payment, or trace number, or other payment identifying information, such as check number."[25]

**The Paperwork Reduction Act (PRA)**

28.    Congress enacted the PRA to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." 44 U.S.C. §§ 3501(2), (7).

29.    To accomplish those goals, the PRA mandates that every agency must "ensure that the public has timely and equitable access to the agency's public information," *id.* § 3506(d)(1), and it defines "public information" broadly to include "any information, regardless of form or

---

[23] DOJ, *Overview of the Privacy Act* at 23 (2020 ed.) (citing *Whitaker v. CIA*, 31 F. Supp. 3d 23, 48 (D.D.C. 2014)).
[24] BFS, System of Records Notice (SORN), 85 Fed. Reg. 11776, 11779 (Feb. 27, 2020).
[25] *Id.* at 11780.

format, that an agency discloses, disseminates, or makes available to the public." *Id.* § 3502(12). The Act further mandates that agencies must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id.* § 3506(d)(3).

30. Government-wide guidelines issued by the Office of Management and Budget state that the term "information dissemination product" includes "any electronic document … or web page" that an agency disseminates to the public.[26]

## FACTUAL ALLEGATIONS

**The Administration Advocates for Compensating January 6th Defendants**

31. On January 6, 2021, a violent mob incited by President Trump attacked the United States Capitol to stop the constitutionally mandated transfer of presidential power following the 2020 election. The mob forced the Vice President and other lawmakers to flee for their lives, temporarily stopping the counting of electoral votes mandated by the Twelfth Amendment. *See Anderson v. Griswold*, 543 P.3d 283, 329 (Colo. 2023), *rev'd on other grounds sub nom. Trump v. Anderson*, 601 U.S. 100 (2024) (per curiam).

32. Throughout the day, the mob repeatedly and violently assaulted law enforcement officers who were trying to defend the Capitol. Many of the participants in the attack stole objects from the Capitol's premises or from law enforcement officers to use as weapons, including metal bars from the police barricades and officers' batons and riot shields. *Id.* at 331.

---

[26] Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication, 67 Fed. Reg. 8452, 8460 (Feb. 22, 2002).

33.     More than 140 officers suffered bodily injuries at the hands of rioters, including bruises, lacerations, concussions, rib fractures, and a heart attack.[27] In the days and months after the attack, one officer died from injuries sustained "while physically engaging with protestors,"[28] and four officers committed suicide.[29]

34.     The FBI classified the January 6th attack on the Capitol as an act of domestic terrorism.[30] "Courts have found or described the attack on the Capitol as an insurrection."[31]

35.     Federal prosecutors obtained convictions in 100% of jury trials held for January 6th defendants. More than 1,500 defendants were charged, and more than half opted to plead guilty.[32]

36.     In 2022, the Attorney General appointed a Special Counsel to oversee these investigations and prosecute any individual found to have committed federal crimes.[33] The Special Counsel's investigations led two grand juries to find probable cause for indictments, charging President Trump with 44 criminal counts. The charges included conspiracy to defraud the United States, obstructing an official proceeding, conspiracy against rights, willful retention of national

---

[27] Michael S. Schmidt & Luke Broadwater, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (July 12, 2021), https://tinyurl.com/4sux3wxu.

[28] *Id.*

[29] Jan Wolfe, *Four officers who responded to U.S. Capitol attack have died by suicide*, Reuters (Aug. 2, 2021), https://tinyurl.com/2uttz76z.

[30] Tom Dreisbach, *Donald Trump calls Jan. 6 a "day of love." Here Are the facts.*, NPR (Oct. 29, 2024), https://perma.cc/5EQH-A3HD.

[31] DOJ, *Final Report on the Special Counsel's Investigations and Prosecutions*, Special Counsel Jack Smith, at 62 (Jan. 7, 2025), https://perma.cc/9WA9-DSUM (citing *Anderson*, 543 P.3d at 329); *see also New Mexico ex rel. White v. Griffin*, 2022 WL 4295619, at *17 (N.M. Dist. Ct. Sept. 6, 2022) ("The Court concludes that the January 6, 2021 attack on the United States Capitol and the surrounding planning, mobilization, and incitement constituted an 'insurrection' within the meaning of Section Three of the Fourteenth Amendment."), *cert. denied*. No. 23-279 (Mar. 18, 2024).

[32] Roger Parloff, *The High-Water Mark of the Jan. 6 Prosecutions*, Lawfare (Jan. 6, 2025), https://tinyurl.com/3uh3fsvp.

[33] *See* Off. of the Att'y Gen., Order No. 5559-2022, Appointment of John L. Smith as Special Counsel (Nov. 18, 2022).

security material, and obstruction of justice. *See* Superseding Indictment, *United States v. Trump, et al.*, 23-cr-80101-AMC (S.D. Fla. July 27, 2023); Indictment, *United States v. Trump*, 23-cr-00257-TSC (D.D.C. Aug. 1, 2023).

37.     Following Trump's reelection, the Special Counsel moved to drop all charges, citing DOJ policy that it does not prosecute sitting presidents of the United States. *See* Gov'ts Mot. to Dismiss, *United States v. Trump*, 23-cr-00257-TSC (D.D.C. Nov. 25, 2024); Gov'ts Mot. to Dismiss Appeal, *United States v. Trump*, 24-12311-J (11th Cir. Nov. 25, 2024).

38.     President Trump has long characterized investigations into the January 6th attacks as illegitimate, claiming in a Fox News interview that "most of the people were absolutely innocent," a claim contradicted by defendants' own guilty pleas and the government's trial conviction record.[34] Trump has also repeatedly characterized these federal law enforcement activities as unlawful "weaponization" and "lawfare" directed at him and his political supporters.[35]

39.     As early as January 29, 2022, Trump declared: "If I run and I win, we will treat those people from Jan. 6 fairly . . . and if it requires pardons, we will give them pardons, because they are being treated so unfairly."[36]

40.     On January 20, 2025, within hours of taking the oath of office, President Trump granted clemency to every person charged or convicted for their role in the January 6th attacks,

---

[34] *See* Tara Suter, *Trump lists 'number of reasons' for pardoning violent Jan. 6 rioters*, The Hill (Jan. 23, 2025), https://tinyurl.com/2uswaaxs.

[35] *See, e.g.*, Rebecca Jacobs, *Trump has threatened dozens of times to use the government to target political enemies*, CREW (May 22, 2024), https://tinyurl.com/4ax422fr; Derek Hawkins et al., *How Trump has become angrier and more isolated on Truth Social*, Wash. Post (Apr. 22, 2024), https://tinyurl.com/5ay66htw; Emma Colton, *Trump blasts ongoing 'lawfare' in 1st public remarks since Congress certified his election*, Fox News (Jan. 7, 2025), https://tinyurl.com/4t7j78a4.

[36] *See* J. David Goodman & Emily Cochrane, *Trump Says He Would Consider Pardons for Jan. 6 Defendants if Elected*, N.Y. Times (Jan. 30, 2022), https://tinyurl.com/jvy27yha.

calling efforts to prosecute them "a grave national injustice that has been perpetrated upon the American people over the last four years and begin[] a process of national reconciliation."[37]

41.     In March 2025, Trump publicly confirmed his administration was discussing the creation of a compensation fund for pardoned January 6th defendants, stating: "A lot of people that are in government now talk about it because a lot of the people in government really like that group of people."[38]

**The Establishment of the Slush Fund**

42.     On January 29, 2026, Trump, two of his sons, and the Trump Organization filed suit in the U.S. District Court for the Southern District of Florida against the IRS and the Treasury, seeking at least $10 billion in damages based on the unauthorized disclosure of Trump's tax returns by former government contractor Charles Littlejohn.[39]

43.     At no point did any attorney from the Department of Justice enter an appearance in the case to defend the interests of the United States.

44.     President Trump's claims were subject to formidable threshold defenses that DOJ had vigorously litigated in similar cases concerning Littlejohn's leaks, including cases litigated during President Trump's current term.[40] Yet DOJ declined to raise any defenses in *Trump v. IRS*.

---

[37] Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025).

[38] *See* Susan Carpenter, *Trump says government is talking about compensation fund for Jan. 6 rioters*, Spectrum News NY1 (Mar. 26, 2025), https://tinyurl.com/ywc8m5b2.

[39] *See* Complaint, *Trump v. IRS*, 26-cv-20609, ECF 1 at ¶¶ 1-5 (S.D. Fla Jan. 29, 2026); see Andrew Duehren & Chris Cameron, *Trump Sues I.R.S. Over Tax Data Leak, Demanding $10 Billion*, N.Y. Times (Jan. 29, 2026), https://tinyurl.com/68vbfvdk.

[40] *See, e.g.*, U.S. Mot. to Dismiss 2d Am. Compl. at 1-2, *Griffin v. IRS*, 22-cv-24023, ECF 58 (S.D. Fla. Nov. 27, 2023) (seeking dismissal because, among other things, Littlejohn was not a government employee); U.S. Mot. to Dismiss at 1, *Safe Harbor Int'l, LLC v. IRS*, 25-cv-139, ECF 31 (D. Md. July 23, 2025) (same).

45.     Recognizing the extraordinary posture of a sitting President suing federal agencies under his control, the court in *Trump v. IRS* sua sponte ordered briefing by the parties on whether the case presented a justiciable "Case" or "Controversy" under Article III.

46.     The Court granted leave to CREW, and CREW filed an amicus brief in the case urging the court to stay the case and enjoin any settlement because the suit raised grave separation-of-powers and ethical concerns, DOJ attorneys faced an unavoidable conflict of interest, and any monetary settlement would violate the Domestic Emoluments Clause.[41]

47.     The court also appointed amici to submit arguments to assist the court in deciding whether the case was justiciable under Article III. Court-appointed amici submitted their brief on May 14, 2026, stating that "[t]his case is unprecedented: A sitting president seeks monetary damages for alleged harm to his personal interests from an executive agency that he controls. That presents significant Article III subject matter jurisdiction concerns."[42]

48.     Prior to the Court's May 27 hearing scheduled to address these jurisdictional concerns, Plaintiffs filed a Notice of Voluntary Dismissal with Prejudice on May 18, 2026, thus preventing judicial review of the constitutional defects the court and court-appointed amici had identified.[43]

49.     The same day, DOJ, led by Acting Attorney General Todd Blanche who previously served as Trump's criminal defense attorney, entered into a settlement agreement with President Trump. The May 18 settlement agreement and corresponding order of the Acting Attorney General

---

[41] Br. of Amici Curiae CREW & Pub. Citizen, *Trump v. IRS*, 26-cv-20609 (S.D. Fla. Feb. 12, 2026), ECF 15.

[42] Br. of Court-Appointed Amici Curiae, *Trump v. IRS*, 26-cv-20609 (S.D. Fla. May 14, 2026), ECF 45.

[43] Not. of Vol. Dismissal, *Trump v. IRS*, 26-cv-20609 (S.D. Fla. May 18, 2026), ECF 52.

incorporating and purporting to effectuate its terms purported to create a $1.776 billion slush fund referred to as the "Anti-Weaponization Fund."[44]

50.     The Order provided that the Fund will consist of five "Members" appointed by the Attorney General and removable by the President alone. And it vested the Fund with final, unreviewable power to dole out nearly $1.8 billion in federal funds under a shroud of secrecy and in disregard for the transparency and accountability requirements of the Judgment Fund statute, the Federal Records Act, and the FOIA.[45]

51.     The slush fund order adopted Trump's and the January 6th defendants' victimhood narrative, claiming that legitimate law enforcement actions were in fact "representative of the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents."[46]

52.     Following the fund's announcement, convicted January 6th defendants and other of the President's political cronies, such as prominent purveyors of election-related misinformation, confirmed their intent to seek payouts through the fund, with one convicted defendant stating that news of the fund was "all over Twitter [and] our group chats."[47]

---

[44] *See* Press Release, DOJ, *supra* n.1; Settlement Agreement of May 18, 2026, *Trump v. IRS*, 26-cv-20609 (S.D. Fla.), https://perma.cc/3ATE-YVGK; Attorney General Order of May 18, 2026, https://perma.cc/5GGE-D3YV.

[45] *Id.*

[46] *See* Settlement Agreement of May 18, 2026 at ¶ II.C, *Trump v. IRS*, 26-cv-20609 (S.D. Fla.), https://perma.cc/3ATE-YVGK.

[47] *See* Gabe Kaminsky, *Trump's $1.7+ billion fund sparks rush to capitalize: "All J6ers will apply"*, CBS News (May 19, 2026), https://tinyurl.com/mhh82eke.

53.     Lawyers representing pardoned January 6th defendants also confirmed they expected their clients to apply for awards through the fund, which they otherwise would have had to seek through pending or future litigation.[48]

54.     The creation of the slush fund was met with sharp criticism from both sides of the political aisle, and the fund was quickly challenged in court for violating the Constitution and a variety of federal statutes.[49] In the face of these challenges, on June 2, 2026, the Acting Attorney General testified in a congressional hearing that DOJ was "not moving forward with the Fund."[50]

55.     Following that announcement, the *Trump v. IRS* court reopened the case to determine whether the parties to the suit "ignored ethical norms, court rules, and legal authority to manipulate the judicial process" and "whether they did so to gild their efforts to gain unprecedented access to the public fisc with the patina of legitimacy." *Trump v. IRS*, 26-cv-20609, 2026 WL 2015525, at *1 (S.D. Fla. July 13, 2026). The Court ultimately answered those questions in the affirmative, holding that "this matter was brought for an improper purpose—to gain the imprimatur of judicial legitimacy for a 'settlement' that had no viable basis in law or fact," and that "this case is part of Mr. Trump's pattern of misusing the courts to serve political purposes." *Id.* at *17 (cleaned up).

56.     On the evening of August 2, 2026, Acting Attorney General Blanche posted on X that he had unilaterally rescinded the May 18 Order that established the slush fund.[51] The legal effect of that rescission remains unclear, however, given that it was issued without the agreement

---

[48] *Id.*

[49] *See* Bolton, *supra* n.2; *CREW v. DOJ*, 26-cv-1789 (D.D.C.); *Floyd v. DOJ*, 26-cv-01399 (E.D. Va.).

[50] House Appropriations Committee, *Oversight Hearing – DOJ*, at 40:30-41:00 (YouTube, June 2, 2026), https://tinyurl.com/ym67xahs.

[51] *See* Acting Att'y Gen. Todd Blanche (@DAGToddBlanche), X, *supra* n.3.

of the other parties in *Trump v. IRS*, and the settlement agreement in that case, which incorporates the May 18 Order, can be modified "only by written agreement of the Parties."[52]

**Use of the FTCA Claims Settlement Process to Funnel Federal Dollars to January 6th Participants and Other Political Allies**

57.    In the wake of the purported demise of the slush fund, hundreds of January 6th defendants and other of the President's political allies are reportedly seeking an alternate path to obtain federal payouts. Many are now focused on using the FTCA claims settlement process to secure payments from the federal government for alleged injuries related to their arrest, prosecution, and imprisonment following their participation in the attack on the U.S. Capitol.[53] According to Mark McCloskey, an attorney representing many January 6th defendants, most of his clients have already filed FTCA claims seeking "$1 million to $10 million" for their injuries.[54]

58.    Other January 6th defendants have filed a class action complaint, claiming entitlement to damages under the FTCA.[55]

59.    Former Proud Boy leader Enrique Tarrio, who was convicted of seditious conspiracy for his role in the January 6th attack, said, "I believe even if this fund is killed in courts or at a congressional level, the President will find a way. . .They can just settle the tort claims and lawsuits. That has no judicial review or congressional oversight. And it would mean a lot more money in compensation."[56]

---

[52] *See* Settlement Agreement of May 18, 2026, *supra* n.1.

[53] Arthur Delaney & Dave Jamieson, *Dropping The 'Anti-Weaponization Fund' Doesn't Mean Trump Admin Won't Pay Rioters*, HuffPost (June 3, 2026), https://tinyurl.com/45tnjxnt.

[54] Zoe Tillman, *Trump Pardoned Them for Jan. 6. Now They Want Millions of Dollars*, Bloomberg (Dec. 10, 2025), https://tinyurl.com/4xyw9f2b; Peter Yankowski, *Lawyer seeking money for Jan. 6 Capitol rioters says some may be from CT*, CtPost (Dec. 11, 2025), https://tinyurl.com/4ew7pkyw.

[55] *See* Complaint, Dkt. No. 1, *Sullivan v. United States*, 26-cv-220 (M.D. Fla. Mar. 27, 2026).

[56] Anna Bower (@AnnaBower), X (June 2, 2026, at 3:23PM), https://tinyurl.com/44vfe342.

60.     Shortly after the Acting Attorney General testified that DOJ was not moving forward with the fund, Associate Attorney General Stanley Woodward replied to an X post from the late-Senator Lindsay Graham about using the FTCA claims settlement process to compensate January 6th defendants from the Judgment Fund by stating, "We're on it." The post was later deleted.[57] And President Trump confirmed as recently as August 2, 2026, that he continues to support payments to January 6th defendants, stating that "they had their lives destroyed" and compensating them "would be a reimbursement for the pain that they suffered."[58]

61.     Despite the legal weaknesses inherent in any FTCA case brought by a convicted January 6th defendant and the admonishment of the *Trump v. IRS* court regarding the administration's unscrupulous attempts to raid the public fisc for the benefit of convicted felons and other of the President's political allies, it is not simply conjecture to predict that the Trump-Vance administration will misuse the FTCA claims settlement process to provide payouts from the Judgment Fund and will rely on Treasury's noncompliance policy to shield payment information from public disclosure. The administration has recently used this playbook by awarding generous settlements to January 6th participants and other political allies despite obvious defenses the government could have used to challenge the claims they asserted. And Treasury has withheld payment information related to these suspect settlements, even though the Privacy Act clearly does not attach in these cases.

62.     For example, on March 17, 2026, the United States entered into a compromise settlement with President Trump's former National Security Advisor, Michael Flynn, in the

---

[57] Alexander Mallin, *Top DOJ official deletes post suggesting alternate plan for compensating alleged 'weaponization' victims*, ABC News (June 3, 2026), https://tinyurl.com/5ywphrxf.

[58] Jeremy Roebuck, *Blanche formally rescinds plan for 'weaponization' fund, in deal to advance AG nomination,* Wash. Post (Aug. 3, 2026), https://tinyurl.com/mrbkfun2.

amount of $1.25 million to settle the claims in *Flynn v. United States*, 23-cv-485 (M.D. Fla.). Flynn alleged that he was wrongfully prosecuted for making false statements to federal agents who were investigating links between Russia and Donald Trump's 2016 presidential campaign. DOJ settled Flynn's FTCA suit despite the fact that Flynn had already pleaded guilty to lying to the FBI[59] and a district court had already dismissed Flynn's FTCA complaint. *Flynn v. United States*, 23-cv-485, 2024 WL 5057537, at *8 (M.D. Fla. Dec. 10, 2024). Given these facts, members of Congress have openly questioned DOJ's decision to abandon its defense of the lawsuit and instead provide Flynn a substantial monetary settlement.[60]

63. Flynn's name, the individual names of his counsel, and the alleged facts giving rise to his claims are publicly available as part of the judicial proceedings. *Id.* Indeed, DOJ released the Flynn settlement agreement in response to a FOIA request,[61] and the agreement is currently published on DOJ's website.[62] Nevertheless, Treasury has withheld details about the Flynn settlement payment under the pretense of the Privacy Act.

64. An entry in the first biweekly Judgment Fund report that Treasury issued in April 2026 reflects a payment in the amount of $1.25 million and identifies the law firm Binnall Law

---

[59] *See* Plea Agreement, Dkt. No. 3, *United States v. Flynn*, 17-cr-232 (D.D.C. Dec. 1, 2017); *see also Flynn v. United States*, 23-cv-485, 2024 WL 5057537, at *8 (M.D. Fla. Dec. 10, 2024) (noting that Flynn subsequently alleged that he was coerced into entering a plea agreement under the threat that his son would be prosecuted if he did not cooperate). During President Trump's first term in office, DOJ withdrew the criminal charges against Flynn, and the President granted him a pardon. *See* Executive Grant of Clemency, https://tinyurl.com/3cfnwmnn.

[60] *See* Letter from Rep. Jamie Raskin to Acting Attorney General Todd W. Blanche (Apr. 6, 2026), https://tinyurl.com/47k73fwv.

[61] Anna Bower, *U.S. Government Agrees to $1.25 Million Settlement in Michael Flynn Suit*, Lawfare (Apr. 17, 2026), https://tinyurl.com/4xm4b95d.

[62] Stipulation for Compromise Settlement and Release of [FTCA] Claims Pursuant to 28 U.S.C. § 2677, *Flynn v. United States*, 23-cv-485 (M.D. Fla.) (Mar. 17, 2026), https://perma.cc/R8T9-CW73.

Group, PLLC (the firm that represented Flynn) as the claimant's counsel.[63] But the entry does not identify Flynn or his counsel by name, the "citation code description" associated with the entry identifies 28 U.S.C. § 2677 as the code section giving rise to the claim, and the entry identifies "Fls-Arrest" as the factual basis for the payment. Flynn's complaint does not invoke 28 U.S.C. § 2677, which is a general authorization for the Attorney General to enter compromise settlements, nor did he raise a false arrest claim in his suit.[64] To the extent this entry corresponds to the Flynn settlement payment, these descriptors are both inaccurate and misleading.

65.    On April 21, 2026, the United States entered into an agreement to settle claims brought by Carter Page, an aide on Trump's 2016 presidential campaign. Page initially filed suit in 2020 against the United States and individual FBI officials alleging to be a victim of unlawful surveillance. *Page v. Comey*, 20-CV-3460 (D.D.C.). The district court dismissed his case, and the D.C. Circuit upheld that dismissal on the grounds that Page's claims were either time-barred or insufficiently pleaded. *Page v. Comey*, 628 F. Supp. 3d 103 (D.D.C. 2022), *aff'd*, 137 F.4th 806 (D.C. Cir. 2025). Despite having successfully defended the matter before the district and appellate courts, the government entered into a settlement agreement with Page while his petition for certiorari was pending with the Supreme Court.[65] Press reports indicate the settlement amount was $1.25 million.[66]

66.    Page's name, the individual names of his counsel, and the alleged facts giving rise to his claims are publicly available as part of the judicial proceedings, among other sources.

---

[63] U.S. Dep't of the Treasury, Bureau of Fiscal Service, *supra* n.20.

[64] *See* Second Amended Compl., *Flynn v. United States*, 23-cv-485 (M.D. Fla.) (June 3, 2025) (asserting claims for malicious prosecution (count 1), and abuse of process (count 2)).

[65] *See* Br. for the United States at 6, *Page v. Comey*, No. 25-705 (S. Ct. 2026).

[66] Kyle Cheney & Josh Gerstein, *Trump admin agrees to pay $1.25M to 2016 Trump advisor over surveillance*, Politico (Apr. 22, 2026), https://tinyurl.com/2kbft2my.

Nevertheless, Treasury has withheld details about the Page settlement payment under the pretense of the Privacy Act.

67.    An entry in the first biweekly Judgment Fund report issued in May 2026 reflects a payment in the amount of $1.25 million and identifies the law firm Schaerr Jaffe LLP (the firm that represented Page) as the claimant's counsel.[67] But the entry does not identify Page or his counsel by name, the "citation code description" associated with the entry identifies 28 U.S.C. § 1491 as the code section giving rise to the claim, and the entry identifies "breach of express contract" as the factual basis for the payment. Page's complaint does not invoke 28 U.S.C. § 1491, which governs the jurisdiction of the Court of Federal Claims, nor did he raise a breach of contract claim in his suit.[68] To the extent this entry corresponds to the Page settlement payment, these descriptors are both inaccurate and misleading.

68.    On June 6, 2025, the United States entered into a settlement with the estate of Ashli Babbitt to settle the claims in *Estate of Ashli Babbitt v. United States*, 24-cv-01701 (D.D.C.). Babbitt died while participating in the January 6th attack on the U.S. Capitol. A joint investigation conducted by DOJ and the Washington Metropolitan Police Department (MPD) determined that "Babbitt was among a mob of people that entered the Capitol building and gained access to a hallway outside 'Speaker's Lobby,' which leads to the Chamber of the U.S. House of Representatives."[69] The investigation concluded that U.S. Capitol Police (USCP) officers attempted to prevent the mob from passing through the doors to the lobby and the chamber, but

---

[67] U.S. Dep't of the Treasury, *supra* n.63.

[68] *See* Second Amended Compl., *Page v. Comey*, 20-cv-3460 (D.D.C. June 8, 2021) (asserting violations of the Foreign Intelligence Surveillance Act (FISA) (claims 1-4); abuse of process under the FTCA (claim 5); violation of the Fourth Amendment (claim 6); violation of the Privacy Act (claims 7-8); and violation of the Patriot Act (claim 9)).

[69] Press Release, *Department of Justice Closes Investigation into the Death of Ashli Babbitt*, DOJ (Apr. 14, 2021), https://perma.cc/R7WF-L5MJ.

"[m]embers of the mob attempted to break through the doors by striking them and breaking the glass with their hands, flagpoles, helmets, and other objects."[70] The investigation further found that, at one point, "Babbitt attempted to climb through one of the doors where glass was broken out" and an officer "fired one round from his service pistol, striking Ms. Babbitt in the left shoulder."[71] Babbitt was eventually "transported to Washington Hospital Center, where she succumbed to her injuries."[72]

69.    Babbitt's estate filed suit under the FTCA in 2024.[73] The United States settled the suit for $4.95 million,[74] despite multiple federal investigations having concluded that the officer who shot Babbitt did not engage in wrongdoing. A USCP investigation "determined the officer's conduct was lawful and within Department policy."[75] A joint DOJ/MPD investigation revealed "no evidence to establish that, at the time the officer fired a single shot at Ms. Babbitt, the officer did not reasonably believe that it was necessary to do so in self-defense or in defense of the Members of Congress and others evacuating the House Chamber."[76]

70.    USCP Chief Tom Manger publicly stated: "I am extremely disappointed and disagree with this settlement . . . This settlement sends a chilling message to law enforcement nationwide."[77]

---

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] Compl., *Estate of Ashli Babbitt v. United States*, 24-cv-01701 (D.D.C. Jan. 5, 2024).

[74] Stipulation for Compromise Settlement and Release of [FTCA] Claims Pursuant to 28 U.S.C. § 2677, *Estate of Ashli Babbitt v. United States*, 24-cv-01701 (D.D.C. June 6, 2025), https://perma.cc/DC2C-UGJJ.

[75] Press Release, *USCP Completes Internal Investigation into the January 6 Officer-Involved Shooting*, U.S. Capitol Police (Aug. 23, 2021), https://tinyurl.com/47f5rxue.

[76] Press Release, DOJ, *supra* n.69.

[77] *See* Nicholas Wu, *Outgoing Capitol Police chief blasts reported settlement in Jan. 6 shooting*, Politico (May 19, 2025), https://tinyurl.com/bdrrszzj.

71.     Babbitt's name, the individual names of her estate's counsel, and the alleged facts giving rise to the estate's claims are readily available to the public as part of the judicial proceedings and through multiple reports issued by federal agencies. Moreover, because Babbitt is deceased, the Privacy Act does not apply to her or her next-of-kin, and the estate of Ashli Babbitt is a decedent's estate, not an individual person. Additionally, Babbitt's estate has publicly released the settlement agreement on its attorneys' website.[78] Nevertheless, Treasury has withheld details of the settlement payment to the Babbitt estate under the pretense of the Privacy Act.

72.     An entry in the first biweekly Judgment Fund report issued in July 2025 reflects a payment in the amount of $4.95 million and identifies Judicial Watch, Inc. (the organization that represented the Babbitt estate) as the claimant's counsel.[79] But the entry does not name Babbitt, her estate, her next-of-kin, or the individual counsel for the estate. The "citation code description" associated with the entry identifies 28 U.S.C. § 2677 as the code section giving rise to the claim, and the entry identifies "Miscellany" as the factual basis for the payment. The Babbitt estate's complaint did not invoke 28 U.S.C. § 2677, which is a general authorization for the Attorney General to enter compromise settlements, it did not reference "miscellany," and the term "miscellany" does not accurately summarize the facts giving rise to the claims at issue in that suit.[80] To the extent this entry corresponds to the Babbitt settlement payment, these descriptors are both inaccurate and misleading.

---

[78] Press Release, *Judicial Watch Announces $4.975 Million Settlement of Ashli Babbitt Wrongful Death Lawsuit with U.S. Government*, Judicial Watch (June 6, 2025), https://tinyurl.com/f63t43f8; *see also* Stipulation for Compromise Settlement and Release of [FTCA] Claims Pursuant to 28 U.S.C. § 2677, *Estate of Ashli Babbitt v. United States*, 24-cv-01701 (D.D.C. June 6, 2025), https://perma.cc/DC2C-UGJJ.

[79] U.S. Dep't of the Treasury, *supra* n.63.

[80] *See* Compl., *Estate of Ashli Babbitt v. United States*, 24-cv-01701 (D.D.C. (Jan. 5, 2024) (asserting claims for assault and battery (count 1); negligence (counts 2-5); a survival action (count 6); and wrongful death (count 7)).

73. These cases demonstrate that Treasury is withholding certain information from the biweekly Judgment Fund report that it is legally obligated to publish, and it includes information in that report that is inaccurate and misleading.

74. Indeed, the Privacy Act's inapplicability to these cases is confirmed by the fact that, outside the Judgment Fund context, Treasury routinely discloses the names of litigants and factual summaries of publicly filed cases that have been settled. For example, Treasury publicly issues reports, such as the "National Proliferation Financing Risk Assessment" [81] and "National Terrorist Financing Risk Assessment,"[82] that contain extensive details of the facts underlying plea agreements and settlement agreements, including the names of litigants or embedded links that reveal those names. And Treasury maintains other documents on its public website, such as a "case highlights" document, that discloses the names of U.S. persons who have entered into plea agreements with the federal government and the facts surrounding those matters. [83] And other agencies, including the Department of Justice, routinely disclose this type of information in a variety of formats, including publicly issued press releases.[84]

**Injuries to CREW**

75. As a watchdog organization dedicated to government transparency and oversight that routinely requests federal records and relies on them to perform its mission-critical functions,

---

[81] U.S. Dep't of the Treasury, *2024 National Proliferation Financing Risk Assessment* at 22 (Feb. 2024) (discussing the details of settlement agreements relating to anti-money laundering and sanctions laws), https://tinyurl.com/ph5efu9t.

[82] U.S. Dep't of the Treasury, *2024 National Terrorist Financing Risk Assessment* at 5, 9, 15 (Feb. 2024) (discussing the details of settlement agreements relating to anti-money laundering and sanctions laws), https://tinyurl.com/5n7dtby3.

[83] U.S. Dep't of the Treasury, *Case Highlights* at 2, https://tinyurl.com/2tv53kj8.

[84] *See, e.g.,* Press Release, *Justice Department Secures $325,000 Settlement in Sexual Harassment Lawsuit Against Iowa Landlord and Property Manager*, DOJ (Jan. 9, 2026), https://tinyurl.com/2fzkjt9n.

CREW is concretely harmed by Treasury's noncompliance policy and its practice of publishing incomplete, inaccurate, and misleading information about Judgment Fund payments.

76.    As part of its mission-critical functions, CREW routinely requests and uses government records made available to it under federal transparency laws. CREW uses that information to create public-facing reports, administrative complaints, requests for investigation, and public testimony and letters to Congress regarding oversight matters, and to craft targeted FOIA requests for additional information. CREW widely disseminates these materials to the public through its website, which receives hundreds of thousands of page views every month.

77.    Treasury's noncompliance policy and its practice of issuing misleading case codes and descriptors prevents CREW from obtaining and disseminating critical information about the Trump-Vance administration's potentially unscrupulous payouts to January 6th defendants and other of the President's political allies. While some of the underlying information that Treasury withholds may be available through other sources, such as public court filings, Treasury's noncompliance policy inhibits CREW's ability to review payment information from one, definitive source and to conclusively correlate Judgment Fund payment records to corresponding claimants and the facts giving rise to their claims.

78.    CREW has several pending FOIA requests issued during the Trump-Vance administration for records relating to FTCA claims asserted by January 6th defendants and settlement negotiations between DOJ and claimants' counsel and intends to submit similar requests in the future. Treasury's noncompliance policy degrades CREW's ability to craft sufficiently targeted FOIA requests seeking information about particular Judgment Fund payments that may have been made since the beginning of the Trump-Vance administration and to fully scrutinize

and provide the public with an accurate accounting of the administration's use of the Judgment Fund to execute potentially illegitimate payouts.

79.     Following President Trump's January 20, 2025, pardons of January 6th defendants, CREW initiated, and currently maintains and operates, a tracking project documenting recidivism among pardoned January 6th defendants.[85] The tracking project has been cited in congressional reports[86] and by major media outlets.[87] Information currently withheld under Treasury's noncompliance policy would directly contribute to this preexisting and ongoing CREW project. With access to more fulsome information about Judgment Fund payments, CREW would add to its existing public tracker an accounting of payments of taxpayer funds made by the government to pardoned January 6th defendants who were charged with or convicted of additional crimes and would identify the individual claimants, their counsel, the amount of payment, and the government's stated factual basis for payment, allowing the public to see, in a single source, how taxpayer dollars are flowing to recidivist January 6th defendants. Treasury's noncompliance policy currently prevents CREW from taking these actions.

80.     At the beginning of the Trump-Vance administration, CREW also initiated, and currently maintains and operates, a public tracker of the President's conflicts of interest and a

---

[85] Linnaea Honl-Stunkel, Sophia Barriga Hernandez & Alyssa Meiman, *At least 40 pardoned insurrectionists face other criminal charges-with 12 offending since Trump's pardon*, CREW (June 3, 2026), https://tinyurl.com/y52ekaeb.

[86] *See* Staff of House Committee on the Judiciary, *One Year Later: Assessing the Public Safety Implications of President Trump's Mass Pardons of 1,600 January 6th Rioters and Insurrectionists*, (Jan. 2026), https://tinyurl.com/df4jwxy4.

[87] *See, e.g.*, The Editorial Board, *The People Trump Pardoned Are on a Crime Spree*, N.Y. Times (Mar. 31, 2026), https://tinyurl.com/5n98bj8r; Matt K. Lewis, *Freed by Trump, the Jan. 6 criminals are preying on children and others*, L.A. Times (May 15, 2026), https://tinyurl.com/mtw2xkd7.

program tracking the conflicts of interest of Executive Branch officials across the administration.[88] Compliance with the disclosure provisions of the Judgment Fund statute will also contribute to this preexisting and ongoing project. With access to information about claimants, their counsel, and underlying facts relating to payments, CREW would be able to (i) identify claimants who have a financial relationship with the President or his family and who have obtained Judgment Fund disbursements; and (ii) analyze trends in how the government issues payment across cases, with particular attention to whether claimants with financial or political ties to the administration are treated similarly to those without such ties.

81.     CREW regularly provides testimony, briefings, and technical assistance to Congressional committees conducting oversight of federal spending and advocates for legislative reforms to strengthen Congress's appropriations powers and prevent Executive Branch end-runs around the appropriations process. Information about claimants, their counsel, and underlying facts relating to payments would inform advocacy programs that CREW has pursued in the Trump-Vance administration, including by allowing CREW to publish reports relating to the use of the Judgment Fund in this administration and make fulsome recommendations regarding potential legislative fixes aimed at preventing waste, fraud, and abuse. [89]

82.     Treasury's noncompliance policy, including its practice of publishing inaccurate or misleading information, directly impairs CREW's ability to perform its mission-critical functions and deprives CREW of highly valuable government information to which it is statutorily entitled.

---

[88] CREW, *Tracking Trump's visits to his properties and other conflicts of interest*, (updated May 21, 2026), https://tinyurl.com/mry26wpr.

[89] *See, e.g.*, CREW, *January 6ers cost taxpayers $2.7 billon. Now they're seeking secret payouts* (July 22, 2026), https://tinyurl.com/5n7ahss3.

## CLAIMS FOR RELIEF

### COUNT I
### APA Contrary to Law (Judgment Fund Statute)
### (Against All Defendants)

83.     CREW re-alleges and incorporates by reference all preceding paragraphs.

84.     The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

85.     The Judgment Fund statute requires Treasury to disclose on its public website, with respect to each Judgment Fund payment, "[t]he name of the plaintiff or claimant"; "[t]he name of counsel for the plaintiff or claimant"; and "[a] brief description of the facts that gave rise to the claim." 31 U.S.C. §§ 1304(d)(2), (3), (5). Treasury is required to make these disclosures "unless the disclosure of such information is otherwise prohibited by law or a court order," and disclosure must be made "as soon as practicable, but not later than 30 days after the date on which a payment under this section is tendered." *Id.* § 1304(d).

86.     Despite this statutory mandate, Defendants have adopted an across-the-board policy of withholding in all instances the names of plaintiffs or claimants, the names of their individual counsel, and a summary of facts giving rise to the claims being settled. As part of this policy, Defendants have also adopted a practice of publishing in the biweekly Judgment Fund reports a "case citation code" and brief, one-to-two word "citation code description" in lieu of providing a summary of facts required under 31 U.S.C. § 1304(d)(5). These brief descriptors are insufficiently detailed to satisfy the requirements of § 1304(d)(5), and they are often inaccurate or misleading because they often lack any rational relation to the claims that serve as the basis for the corresponding Judgment Fund payment.

87. Defendants' sole justification for the noncompliance policy is that the Privacy Act prohibits disclosure of this information. The Privacy Act, however, does not prohibit disclosure of this information in all instances. For example, the Privacy Act does not prohibit the disclosure of publicly available information, including information disclosed in judicial proceedings, *Barry v. DOJ*, 63 F. Supp. 2d 25, 26 (D.D.C. 1999); it does not apply to deceased persons or their next-of-kin or foreign persons, 5 U.S.C. § 552a(a)(2), *Whitaker v. CIA*, 31 F. Supp. 3d 23, 48 (D.D.C. 2014); it does not prohibit disclosure of information released under FOIA, 5 U.S.C. § 552a(b)(2); and it applies only to information that is both retrievable by personal identifier and actually retrieved by such an identifier, *Paige v. DEA*, 665 F.3d 1355, 1359 (D.C. Cir. 2012).

88. By adopting a unilateral noncompliance policy and withholding relevant information from public disclosure in all instances and by providing only limited and inaccurate "case citation codes" and "citation code descriptions," Defendants have failed to meet their disclosure obligations under the Judgment Fund statute. Defendants have failed to make a considered determination of whether the Privacy Act actually prohibits the disclosure of information they are withholding in each instance, resulting in the withholding of a substantial amount of payment information the disclosure of which is not "otherwise prohibited by law or a court order," 31 U.S.C. § 1304(d). Defendants are therefore acting "not in accordance with law," and the Court must "hold unlawful and set aside" Defendants' unlawful policies and practices. 5 U.S.C. § 706(2).

## COUNT II
### APA Unlawful Withholding or Unreasonable Delay of Statutory Publication Obligations
### (Against All Defendants)

89. CREW re-alleges and incorporates by reference all preceding paragraphs.

90.    Under the APA, a court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

91.    The Judgment Fund statute requires Treasury to disclose on its public website, with respect to each Judgment Fund payment, "[t]he name of the plaintiff or claimant"; "[t]he name of counsel for the plaintiff or claimant"; and "[a] brief description of the facts that gave rise to the claim." 31 U.S.C. §§ 1304(d)(2), (3), (5). Treasury is required to make these disclosures "unless the disclosure of such information is otherwise prohibited by law or a court order," and disclosure must be made "as soon as practicable, but not later than 30 days after the date on which a payment under this section is tendered." *Id.* § 1304(d).

92.    In declining to fulfill these statutory obligations in a timely and fulsome manner with respect to information the disclosure of which is not prohibited by the Privacy Act, Defendants have "unlawfully withheld or unreasonably delayed" taking actions required by law. 5 U.S.C. § 706(1).

**COUNT III**
**APA Contrary to Law (the Paperwork Reduction Act)**
**(Against All Defendants)**

93.    CREW re-alleges and incorporates by reference all preceding paragraphs.

94.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

95.    The Paperwork Reduction Act requires agencies to "ensure that the public has timely and equitable access to the agency's public information." 44 U.S.C. § 3506(d)(1).

96.    By disregarding their responsibilities to publish relevant Judgment Fund payment information in a timely and complete manner, Defendants have failed to ensure timely and equitable access to the Treasury Department's public information in violation of the Paperwork

32

Reduction Act. Accordingly, the Court must "hold unlawful and set aside" Treasury's noncompliance policy. *Id.* § 706(2).

## REQUESTED RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Declare unlawful, vacate, and set aside Defendants' policy of withholding the names of all individual plaintiffs or claimants who receive payments from the Judgment Fund, the names of all individual counsel for those persons, and the brief description of facts that gave rise to the claim in every matter; and Defendants' practice of publishing inaccurate or misleading case citation codes and citation code descriptions;

(2) Order Defendants to post all information required to be disclosed under 31 U.S.C. § 1304(d) on a forward-going basis as soon as practicable, but not later than 30 days after the date on which a payment is tendered;

(3) Order Defendants to post all information required to be disclosed under 31 U.S.C. § 1304(d) with respect to payments issued since the beginning of the Trump-Vance administration, *i.e.*, January 20, 2025, and to correct any inaccurate case citation codes or citation code descriptions associated with those payments within 30 days;

(4) Award Plaintiff its costs and reasonable attorneys' fees in this action; and

(5) Grant such other relief as the Court may deem just and proper.

Date: August 3, 2026                              Respectfully Submitted,

                                                  /s/ Stephen J. Buckingham
                                                  Stephen J. Buckingham (D.C. Bar No. 1562756)
                                                  Jonathan E. Maier (D.C. Bar No. 1013857)
                                                  CITIZENS FOR RESPONSIBILITY
                                                  AND ETHICS IN WASHINGTON
                                                  P.O. Box 14596
                                                  Washington, DC 20004
                                                  (202) 408-5565
                                                  sbuckingham@citizensforethics.org
                                                  jmaier@citizensforethics.org

                                                  *Counsel for Plaintiff*